UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PUGET SOUNDKEEPER ALLIANCE,

Plaintiff,

v.

SEATTLE IRON & METALS CORP.,

Defendant.

Case No. C12-1201-RSM

ORDER GRANTING IN PART PLAINTIFF'S MOTION TO ENFORCE AND MODIFY CONSENT DECREE

## I.   INTRODUCTION

This matter comes before the Court on Plaintiff Puget Soundkeeper Alliance ("Soundkeeper")'s Motion to Enforce and Modify Consent Decree, Dkt. #102.  For the following reasons, the Court GRANTS IN PART Soundkeeper's Motion.

## II.   BACKGROUND

In this case, Soundkeeper alleged that Defendant Seattle Iron & Metals Corporation ("SIMC") violated various provisions of Clean Water Act ("CWA") permits that authorized stormwater and industrial wastewater discharges from SIMC's facilities in Seattle's Georgetown neighborhood used for vehicle and scrap metal recycling and storage.  Dkt. #38.  Relevant here, Soundkeeper alleged that SIMC's scrap handling activities emit dust and harmful particles into the air that contaminate the neighborhood and Duwamish River in violation of the CWA and Resource Conservation and Recovery Act.  *Id*. at 55, 104-08, 134

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 1

The parties settled the case via a Consent Decree, which the Court entered on March 3, 2019. Dkts. #82, #84. Due to needing additional time for necessary "major modification of the design for the auto shredder enclosure to make it more effective[,]" the parties proposed an Amended Consent Decree on September 10, 2020, which this Court entered on October 30, 2020. Dkts. #85 at 2, #88.

The Consent Decree contains a force majeure clause allowing delays "outside the reasonable control of SIMC," including those caused by the actions or inactions of third parties. Dkt. #84 at 11-12. "In such event, the time for performance of the task will be extended for a reasonable period of time following the force majeure event." *Id*. at 12. Any force majeure event must be disclosed "as soon as reasonably possible but, in any case, no later than fifteen days after the occurrence of the event." Id. at 11.

SIMC agreed to build, as mentioned above, an "auto shredder enclosure." This enclosure was part of a required "deduster" under the Amended Consent Decree, which would work to contain SIMC's dust emissions. Dkt. #88 at 2. Rather than a particular deadline, SIMC agreed to "exercise its best efforts to obtain all necessary permits" for the deduster. *Id*. Once permits were obtained, SIMC had to install and commence operation of the deduster within 63 weeks or pay $1,000 per day for delays. *Id*. at 3.

Prior to the installation of the deduster, the Amended Consent Decree required dust emission testing conducted in phases. *Id*. at 5.

Phase I, conducted for 10 weeks between May and August of 2019, measured "background" dust monitoring at several monitoring sites chosen by Dr. Ranajit Sahu, the parties' joint consultant. *Id*. The study was designed to measure "particulate concentrations upwind (South to Southwest)" of SIMC (Dkt. #111, Ex. F. at 1 ) as "to collect samples at locations that

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 2

were not impacted by SIM[C]'s operations." *Id*., Ex. A at 4.

Phase II, which began June of 2020, required SIMC to continuously monitor dust for one year at two of the same locations as Phase I and at "three additional locations selected by Dr. Sahu on the north, south and east fence lines" of SIMC's facility. *Id*. at 6. The purpose of this phase was "intended to document SIMC's dust emissions prior to installation" of the deduster. Dkt. #88 at 6.

Lastly, Phase III would not occur until after installation of the deduster. *Id*. at 6. This would involve two years of continuous monitoring at the same locations as Phase II "to document SIMC's dust emissions following installation[.]" *Id*. at 6-7. Under a "corrective action" provision, if Phase III monitoring from "the first dry season" does not show effective dust emission reductions to (1) 10 $\mu g/m^3$, *or* (2) "the background level determined by Dr. Sahu based on additional data collection," *and* show that polychlorinated biphenyl ("PCB") levels are reduced to the background PCB levels from Phase I, then further enhancements would apply. *Id*. at 8. This would include more inspections and recommendations by Dr. Sahu. *Id*.

The original Consent Decree also contains a "dispute resolution" clause, which provides:

> In the event of a dispute regarding implementation of, or compliance with, this decree, the parties must first attempt to resolve the dispute by meeting to discuss the dispute and any suggested measures for resolving the dispute. Such a meeting should be held as soon as practical but must be held within thirty (30) days after notice of a request for such a meeting to the other party and its counsel of record. If no resolution is reached at that meeting or within thirty (30) days of the notice, whichever occurs first, either party may file a motion with this court to resolve the dispute.

Dkt. #84 at 12.

Original deduster design drawing and a City of Seattle permit application were completed and approved by Dr. Sahu when the parties proposed the Amended Consent Decree on September 10, 2020. After Phase II of the above study, however, SIMC invoked the force majeure clause

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 3

on March 31, 2023. Dkts. #102 at 6, #108 at 3. In an email to Soundkeeper that day, SIMC stated that, while awaiting permits in 2022, the original company contracted to build the deduster, Metso, was acquired by another company. Dkt. #111 at Ex. B. This email notified Soundkeeper that the acquiring company "ha[d] recently indicated to SIMC that it does not intend to honor the September 19, 2019 cont[r]act between Metso and SIMC." *Id*. SIMC said they were in "ongoing" negotiations and "evaluating its options[.]" *Id*. SIMC later retained a different company, Wendt, and new designs were underway by the summer of 2023. Dkt. #108 at 3. SIMC provided a "far enough along" design to Soundkeeper in March 2024. *Id*. at 4.

However, while the original deduster estimate was under $1 million, the new design estimate was "at nearly $4M for the equipment alone." *Id*. Due to this cost increase, SIMC had its environmental consultants "scrutinize" the design "to ensure that it would enable SIMC to achieve the 10 $\mu g/m^3$ action level prescribed" by the Consent Decree. *Id*. SIMC alerted Soundkeeper of this on June 21, 2024. Dkt. #102 at 6.

On April 2, 2025, SIMC stated that it was continuing work on the deduster design and wanted to discuss "some issues with the Phase II study results" with Dr. Sahu. *Id*. at 7, #108 at 7. On April 28, 2025, SIMC requested data from Dr. Sahu, which was provided on August 1 directly from the consultant who worked on the study. *Id*. On August 6, 2025, opining "that SIMC was stalling," Soundkeeper notified SIMC that it was violating the Amended Consent Decree "for not using its best efforts to obtain the deduster permits" and invoked the Decree's dispute resolution process. *Id*. The parties, including SIMC's environmental consultant and Dr. Sahu, had the requested meeting on September 25, 2025, via Zoom. *Id*.

During this September 25 meeting, SIMC's consultant presented a slideshow with criticisms of the Phase I and Phase II testing. First, SIMC alleged that Dr. Sahu did not exclude

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 4

data from wildfires during Phase II, which caused SIMC's data to incorrectly "reflect[] the impacts of one of the largest plumes of wildfire smoke to settle over Seattle in recent memory." Dkt. #108 at 5. As a result, SIMC claimed that its "dry season" average during that time was "well below [the] 10 $\mu g/m^3$ action level[.]" *Id*. at 6. Because of this, SIMC asked the consultant to review Phase I. *Id*. From this, SIMC alleged that Dr. Sahu's upwind testing locations for Phase I were incorrect due to him selecting locations that "are actually downwind or crosswind of SIMC[.]" *Id*. at 7.

The fallout from this meeting lands us here. Filing the instant Motion on November 17, 2025, Soundkeeper requests that the Court find SIMC in civil contempt and impose sanctions for violating the Consent Decree by failing to exercise "best efforts" to obtain permits and install the required deduster. Dkt. #102. Soundkeeper also requests that the Court award costs and extend the Consent Decree (which expires March 15, 2026) to "90 days after full implementation and completion of all requirements herein." *Id*. at 16. SIMC contends that, because its dust emissions were supposedly lower than the "action level," it is not obligated to build the deduster. Dkt. #108. Soundkeeper argues that the deduster is not contingent on the Phase I or Phase II results and that the actions levels only pertain to if any further steps are required after Phase III. Dkt. #112.

### III.    DISCUSSION

#### A.  Consent Decree Violation

Clean Water Act consent decrees are judgments which may be enforced by judicial sanctions in a civil contempt proceeding. *Las Vegas v. Clark Cty.*, 755 F.2d 697, 701 (9th Cir. 1984); *see also Nehmer v. U.S. Dept. of Veterans Affairs*, 494 F.3d 846, 860 (9th Cir. 2007) ("It is well established that the district court has the inherent authority to enforce compliance with a

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 5

consent decree that it has entered in an order, to hold parties in contempt for violating the terms therein."). For civil contempt, the moving party must demonstrate by clear and convincing evidence that (1) the alleged violating party violated a court order, (2) the noncompliance was more than technical or de minimis, and (3) the alleged violating party's conduct was not the product of a good faith or reasonable interpretation of the violated order. *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010).

The Court finds that SIMC has failed to comply with the Consent Decree. While SIMC invoked force majeure when Metso was acquired, SIMC did not notify Soundkeeper until March 31, 2023, while Metso's sale occurred "[i]n 2022," any initial notice that the contract might be cancelled occurred "[i]n the summer of 2022," and Metso's acquirer "formally notif[ied] SIMC that it would not honor the contract in late October 2022" after "a series of meetings[.]" Dkts. #111 at Ex. B, #110 at ¶ 3. While SIMC appears to argue that it exercised its best efforts by continuing to negotiate and seek other offers, it provides no reasoning as to why it did not "notify Soundkeeper of the occurrence . . . no later than fifteen days after the occurrence of the event." Dkt. #84 at 11.

Even with the existence of a force majeure event, SIMC's time was only extended "for a reasonable period[,]" which is not demonstrated by the record. *Id*. at 12. SIMC began design discussions with the new vendor, Wendt, in the summer of 2023, and learned of the higher cost estimate on the deduster system on March 8, 2024. Dkt. #110 at ¶¶ 6-7. SIMC, at minimum, communicated this process during this time to Soundkeeper. Dkt. #102 at 6. However, while SIMC alerted Soundkeeper on June 21, 2024, that it was "conducting some additional engineering studies to confirm fit and functionality of the proposed equipment" while negotiating for the deduster, the record reflects that SIMC only communicated this vague "negotiating"

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 6

language until requesting a meeting to discuss "issues with the Phase II study results" on April 2, 2025. Dkts. #102 at 6-7, #103 at Ex. J, #111 at Ex. D. SIMC communicated that the further studies were part of "working with Wendt to ensure that the equipment, the design of which is still being refined, will achieve the performance standards set forth in the consent decree." Dkt. #111 at Ex. E. But SIMC did not inform Soundkeeper of "encountering some issues" with the testing until April 2, 2025, and requested data from the Phase I and II testing from Dr. Sahu on April 28, 2025. *Id*. at Ex. G and H. While nothing in the docket confirms exact dates, this leads the Court to infer that SIMC learned of these alleged issues with Dr. Sahu's testing between March 2024 and April 2025. But the record is remiss of any notice by SIMC of these alleged issues until it "flagged these issues" and requested data and a future conference call in April 2025. *Id*. at Ex. H; Dkt. #108 at 7. Meanwhile, all of SIMC's communications with Soundkeeper suggested it was working on the design of the deduster, not determining if its existence was necessary.

The Court fails to understand why SIMC did not communicate these issues when it learned of them, when it submitted required quarterly summaries on its progress (*see* Dkt. #88 at 10, Sec. 7(h)), when SIMC requested data and a future meeting, or when Soundkeeper invoked the dispute resolution process.[1] The Consent Decree clearly provides a process for any "dispute regarding implementation of, or compliance with, this decree," which surely a dispute over the very necessity of building a deduster would fall under. Dkt. #84 at 12. Any actual finding on whether the deduster is required is unnecessary to find contempt, as SIMC unilateral decisions render the terms of the Consent Decree irrelevant and "defeats the object of the parties entering

---

[1] Separately, SIMC provides no response at to the gap in time between receiving requests for corrections on its wind fences and trommel enclosure from the City of Seattle (May 29, 2024) and Soundkeeper learning of this and SIMC's lack of response from the City of Seattle (April 17, 2025). Dkt. #103 at ¶ 4 and Ex. Q; *see also* Dkt. #88 at 4 (requiring SIMC "to promptly respond[] to any City of Seattle requests for corrections").

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 7

into a contract." *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011).

Given all of the above, the Court finds that SIMC violated the Consent Decree and has not met its burden of establishing any equitable defense through a good faith and reasonable interpretation of the Decree's terms or otherwise. *See In re Dual Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (holding that a good faith and reasonable interpretation of terms constitutes substantial compliance); *see also Cmty. Ass'n for the Restoration of the Env't v. Nelson Faria Dairy, Inc.*, No. CV-04-3060-LRS, 2011 WL 6934707, at *2 (E.D. Wash. Dec. 30, 2011) (finding no equitable defense when the defendant did not communicate changes or show "reasonable reliance . . . that it did not have to comply with the very specific terms of the Consent Decree").

**B. Remedies**

Soundkeeper requests that the Court impose compensatory and coercive sanctions, award attorneys' fees and costs, and extend the term of the Consent Decree. Dkt. #102 at 15-16.

Soundkeeper points to the parties' stipulated penalty provisions from the Amended Consent Decree. *Id.* at 15. However, these stipulated penalty provisions are based on delays after an agreed upon term following the City of Seattle's issuance of permits. *See* Dkt. #88 at 3, 4, 5. These penalty provisions do not apply here. Soundkeeper also does not suggest, and this Court cannot determine, a proper amount in or reason for coercive sanctions here. Instead, the Court finds an appropriate sanction to be awarding Soundkeeper its attorneys' fees and costs in bringing this Motion to enforce the Decree, per the parties' agreement. *See* Dkt. #82 at 12.

Similarly, both parties suggest that extending the Consent Decree is necessary. Dkts. #102 at 16, #108 at 12. Currently, the Consent Decree terminates on March 15, 2026. Dkt. #88 at 11. "Because the decree contains an express expiration date for the court's retention of

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 8

jurisdiction, any change to that date entails a modification of the decree." *Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009). "The scope of a court's authority in modifying a consent decree is broader than the court's authority in enforcing a consent decree." *Washington v. Moniz*, No. C08-5085RMP, 2015 WL 12643792, at *11 (E.D. Wash. May 11, 2015).

The Court agrees that an extension to the Consent Decree's deadline is necessary to fulfill obligations and/or discuss potential modifications. But the Court disagrees with Soundkeeper's nebulous, perhaps endless, timeline of until "90 days after full implementation and completion of all requirements" has occurred. Dkt. #102 at 16. Instead, the Court will extend the current deadline by six months, giving the parties ample time to meet and confer on remaining requirements and file, if any, further requests for modifications.

## IV.   CONCLUSION

Having considered the instant Motion, relevant briefings, and the remainder of the docket, the Court hereby finds and ORDERS:

(1) Soundkeeper's Motion to Enforce and Modify Consent Decree, Dkt. #102, is GRANTED IN PART.

(2) The Consent Decree's deadline of March 15, 2026, is hereby extended for six (6) months, until September 15, 2026.

(3) SIMC shall pay for Soundkeeper's costs, including reasonable attorneys' fees, incurred in enforcing the Consent Decree. Soundkeeper is direct to file an accounting of these costs within two (2) weeks of this Order. The Court will review this accounting and issue a subsequent order. No response is needed from SIMC unless requested by the Court.

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 9

(4) The Court declines to impose other monetary sanctions.

DATED this 13th day of March, 2026.

_____
Ricardo S. Martinez
United States District Judge

ORDER GRANTING IN PART PLAINTIFF'S MOTION
TO ENFORCE AND MODIFY CONSENT DECREE - 10